Nick MOGENSEN, individually and on behalf of all others similarly situated, Plaintiff,

v.

BODY CENTRAL CORPORATION, B. Allen Weinstein, Thomas Stoltz, and Beth R. Angelo, Defendants.

Case No. 3:12–cv–954–J–20JRK.

United States District Court, M.D. Florida, Jacksonville Division.

Signed March 19, 2014.

David J. George, Holly Kimmel, Kathleen B. Douglas, Paul J. Geller, Robert Jeffrey Robbins, Robbins Geller Rudman & Dowd, LLP, Boca Raton, FL, Francis A. Bottini, Jr., Bottini & Bottini, Inc., La Jolla, CA, for Plaintiff.

Brian Danitz, Jerome F. Birn, Jr., Kelley M. Kinney, Steven M. Schatz, Wilson,

Sonsini, Goodrich & Rosati, PC, Palo Alto, CA, Charles B. Lembcke, Law Office of Charles B. Lembcke, PA, Jacksonville, FL, for Defendants.

### ORDER

HARVEY E. SCHLESINGER, District Judge.

Defendants having notified this Court that they do not wish to convert their motion to dismiss into a motion for summary judgment, (Dkt. 47, filed September 24, 2013), this cause is before this Court on the following filings:

(1) Defendants' "Corrected Motion to Dismiss Corrected Amended Class Action Complaint" (Dkt. 36, filed April 23, 2013), less the Motion's disputed factual assertion, based on Exhibit 11 of Brian Danitz's declaration, that this Court will strike pursuant to its previous Order (Dkt. 46, signed September 18, 2013);

(2) Defendants' "Declaration of Brian Danitz in Support of Defendants' Motion to Dismiss" (Dkt. 37, filed April 23, 2013)' and its attached exhibits;

(3) Plaintiffs "Memorandum of Law in Opposition to Defendants' Motion to Dismiss" (Dkt. 41, filed June 24, 2013);

(4) Defendants' "Reply Memorandum in Support of Their Motion to Dismiss" (Dkt. 45, filed July 19, 2013); and

(5) Defendants' "Unopposed Motion for Oral Argument" (Dkt. 35, filed April 23, 2013).

This Court has considered these filings, determined that this matter does not require oral argument, and now issues this Order.

## I. BACKGROUND [1]

Nick Mogensen, lead Plaintiff, initiated this putative class action suit on August 27, 2012, and filed an Amended Complaint on February 26, 2013. (Dkts. 1, 25). Plaintiff alleges that, between November 10, 2011 and June 18, 2012 (the "class period"), Defendants lied to investors about Body Central's expected growth and sales to artificially inflate its stock prices. Plaintiff further alleges that Defendants Angelo and Weinstein, along with an executive who is not named as a defendant (Angelo's father, Jerrold Rosenbaum), reaped the benefits of this inflation by engaging in insider trading during the class period before Body Central's stock prices plummeted in early May of 2012. On behalf of himself and all others who purchased Body Central common stock during the class period, Plaintiff brought suit under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

### A. The Parties

Plaintiff Nick Mogensen purchased Body Central common stock during the

---

1. This section contains "facts" only for purposes of resolving the Motion to dismiss, and this Court expresses no opinion on any disputed factual matter. This section recites only those facts which are alleged by or incorporated by reference into the Amended Complaint, along with those facts which are subject to judicial notice under Rule 201 of the Federal Rules of Evidence. Specifically, this Court will take notice of "relevant public documents required to be filed with the SEC, and actually filed," but for the sole purpose of determining what the documents contain un-

less the Court otherwise finds that the requirements of Rule 201 are satisfied. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999). Facts taken from the Amended Complaint are assumed true for the purpose of resolving the Motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Finally, for any forward-looking statement cited in the Amended Complaint, this Court will consider any accompanying cautionary statement cited by Defendants that is not subject to material dispute. 15 U.S.C. § 78u–5(e).

class period and suffered an economic loss when the market price of his stock declined. Compl. at ¶¶ 16, 123–35. This Court, in a prior Order, appointed Mr. Mogensen to serve as Lead Plaintiff in this putative class action suit. (Dkt. 17).

Defendant Body Central is a Delaware corporation with its headquarters in Jacksonville, Florida. Body Central retails trendy apparel and accessories for females in their late teens and early twenties who seek a flattering fit at bargain prices. Compl. at ¶¶ 17, 28, 29. To remain profitable, the company needs to anticipate and react quickly to changes in fashion trends and consumer demand. Until the class period, Body Central appears to have done this fairly well. Starting from a single store in Jacksonville in 1972, the company went public in October 2010, and by 2012, the company had expanded to 276 stores across 24 states. Compl. at ¶¶ 2, 28; (Dkt. 36 at p. 4). Body Central stock hit its all-time high on April 27, 2012, but on May 4, 2012, its market price plummeted by approximately 48.55% in the wake of a press release that revealed the company's declining financial performance. Compl. at ¶¶ 5, 7. When Body Central lowered its sales and earnings forecasts a second time on June 18, 2012, the market price of the company's common stock again lost almost half of its value, falling approximately 48%. As of the date of the Amended Complaint, the price of Body Central stock had not recovered. Compl. at ¶¶ 9, 10.

During the class period, Defendant B. Allen Weinstein was President, Chief Executive Officer ("CEO"), and a director of Body Central. On August 16, 2012, Weinstein resigned from his CEO and director positions. Compl. at ¶ 18. During the class period, Defendant Thomas Stoltz was Chief Financial Officer ("CFO"), Executive Vice President, and Treasurer of Body Central. On August 17, 2012, the company announced that Stoltz would become Body Central's Chief Operating Officer ("COO") and interim CEO to replace Weinstein. Compl. at ¶ 19. During the class period, Defendant Beth Angelo was Chief Merchandising Officer ("CMO") of the company. Compl. at ¶ 20.

According to the Amended Complaint, throughout the class period, Weinstein, Stoltz, and Angelo were responsible for ensuring the accuracy of Body Central's public filings and statements, and they personally attested to—and certified the accuracy of—those filings and statements. In short, they controlled the contents of the company's SEC filings and other public statements. By virtue of their positions, they were privy to confidential company information and had access to nonpublic information concerning the company's business, finances, merchandise, markets, and present and future business prospects. Compl. at ¶¶ 21–25.

## B. Body Central's Worsening Sales Performance During the Class Period

By the start of the class period, Body Central had announced plans to expand its business by at least 15% annually through the opening of new stores. Compl. at ¶ 30. During the class period, however, Body Central experienced declining sales performance. According to the Amended Complaint, two factors accounted for this decline: (1) at least since first-quarter 2011 and throughout most of the class period, the company's "lazy buyers" lagged far behind the latest fashions and instead repeatedly reordered the same items for extended periods of time, even reordering merchandise that had previously sold on clearance due to low demand; and (2) during the class period, Weinstein and another executive instituted changes in company policy that resulted in extensive turnover

of key employees and short-staffing at the district management level. Compl. at ¶¶ 31–54.

To support these contentions, the Amended Complaint relies on information given by five anonymous confidential witnesses who worked at the company during the class period: (1) a former regional vice president who oversaw nearly 100 stores across different regions of the country and reported directly to Weinstein; (2) a former senior district manager who oversaw 12 Florida stores and reported to a regional vice president; (3) a former senior district manager who oversaw an unspecified number of stores in three states; (4) a former district manager who supervised 10 Florida and Georgia stores and reported to a regional manager; and (5) a former store manager who oversaw a store in Jacksonville, Florida and reported to a district manager. Compl. at ¶¶ 32 n. 1, 35 n. 2, 36 n. 3, 37 n. 4, 38 n. 5 These confidential witnesses generally described the company's repeated failure to order new, trendy merchandise and excessive inventory mark-downs in their stores. Compl. at ¶¶ 32–42. The second former senior district manager asserted that Body Central failed to meet internal sales goals in the fourth quarter of 2011. Compl. at ¶¶ 37. The witnesses also described Body Central's failure to cure the problem in the first quarter of 2012, when repetitive and "unexciting" products continued to appear on their shelves, and the "horrible" January and February that ensued. Furthermore, according to the confidential witnesses, their stores continued to offer stale merchandise when the company rolled out its inventory for spring 2012, and this negatively impacted their sales in 2012. Compl. at ¶¶ 33, 34, 37–39.

According to the Amended Complaint, the former regional vice president contends that the lack of new, updated merchandise was a primary concern for low- and mid-level management, and the concern was "definitely discussed" with corporate executives—including Weinstein—during Monday morning conference calls with regional vice presidents, corporate executives, and Body Central's buyers. Compl. at ¶ 40. The former regional vice president, first former senior district manager, and former store manager all contend that Weinstein participated in these calls. Compl. at ¶¶ 40–42. Additionally, the former regional vice president asserts that Weinstein was unreceptive to the concerns voiced by lower management during these calls. Compl. at ¶ 40. The Amended Complaint further alleges that Weinstein always participated in conference calls with regional managers and Body Central buyers after a "bad" week of sales. Compl. at ¶ 42.

According to the Amended Complaint, the confidential witnesses also contend that Weinstein changed the pay structure for employees to prevent them from receiving bonuses by setting unrealistic internal sales goals (which were higher than those announced to investors), and this led to a mass exodus of many key district managers, along with a regional director. Compl. at ¶¶ 43–54. According to the former regional vice president, not all of these vacant positions were filled, and new employees with little ability and experience came to occupy the positions that were filled. Other district managers began to leave, and several regions did not have enough district managers to cover their stores. Compl. at ¶¶ 44, 45. With lower management spread too thin, Body Central began to experience heightened management turnover that negatively impacted sales. Compl. at ¶¶ 45–49. Finally, Weinstein allegedly restricted payroll dollars so that store managers lacked the resources to adequately staff their stores. These policy changes, the confidential wit-

nesses contend, led to a short-staffing crisis that greatly exacerbated the company's stale merchandise problem and resulted in declining sales performance. Compl. at ¶¶ 50–54.

## C. Defendants' Allegedly False Statements During the Class Period

According to the Amended Complaint, despite Body Central's declining sales performance, the company's class-period disclosures dishonestly viewed the situation through rose-colored glasses. In particular, Plaintiff alleges that Defendants made six false and misleading public disclosures during the class period: (1) a November 10, 2011 press release and subsequent conference call; (2) Body Central's third-quarter 2011 Form 10–Q filed with the SEC; (3) a January 9, 2012 press release; (4) a March 8, 2012 press release and conference call; (5) Body Central's 2011 Form 10–K filed with the SEC; and (6) a May 3, 2012 press release and conference call. Like the Amended Complaint, this Order holds and italicizes those statements that Plaintiff contends were materially false and misleading.

### 1. November 10, 2011 Press Release and Subsequent Conference Call

After the market closed on November 10, 2011, Body Central issued a press release that reported its financial results for third-quarter 2011 and the year to date. In the press release, Weinstein stated:

Our solid momentum continued in the third quarter as we consistently delivered fashionable merchandise at value prices. *Our comparable store sales performance demonstrates the strength of our existing stores while our new stores are also performing ahead of expectations. We are on target to open 33 new stores in 2011—a record for our Company.* In addition, we remain focused on enhancing our infrastructure and have made several strategic additions to our management team that we believe will better position us to execute on our long term growth objectives.

Compl. at ¶ 55. The next day, before the market opened, the company hosted a conference call to discuss its third-quarter 2011 results and operations. Weinstein, Stoltz, and Angelo participated on behalf of the company, and during the call, Weinstein stated:

Our third-quarter financial results reflect *continued strength in our business.* In addition to delivering strong sales growth and more than doubling our net income, *we have operational initiatives underway that we believe will enhance our ability to achieve our long-term growth objectives.*

\*          \*          \*

*In summary, our business remains healthy overall as our assortments are on trend, our merchandise margins are on plan* and our operating cost continues to be leveraged. *We enter the fourth quarter with our inventory fresh and on plan. We will continue to execute on our goals to expand our services at least 15% annually, drive comparable sales increases,* and build our brand. *We believe that by doing that we can continue to drive long-term profit growth of 20% or more.*

Compl. at ¶ 56. During the call, Weinstein also said that *"[i]nventories are in very good shape and they are very fresh now so we feel good about how we are positioned."* Compl. at ¶ 57.

The next day, Body Central's common stock price rose more than 5% on the heels of these positive outlooks. However, Plaintiff alleges, the highlighted state-

ments were false and misleading when made because they omitted material facts and Defendants knew from their weekly Monday morning conference calls that the company's existing stores were experiencing the stale merchandise problems described above. Additionally, Plaintiff alleges that Defendants knew, or recklessly disregarded, that Body Central's store expansion was a misleading indicator of the company's financial performance and outlook, because they knew about the stale merchandise and short-staffing issues, and those issues left it ill-equipped to expand while simultaneously growing sales. Plaintiff therefore alleges that Defendants lacked a reasonable basis for their positive assessment of Body Central's business, future business, and future growth. Compl. at ¶ 60.

### 2. Body Central's Third–Quarter 2011 Form 10–Q Filed with the SEC

On November 15, 2011, Body Central filed its quarterly report on Form 10–Q for the quarter that ended October 1, 2011. This document was signed by Weinstein and Stoltz, and it stated, in pertinent part:

*We continually update our merchandise* and floor sets with an emphasis on coordinated outfits presented by lifestyle to give our customers a reason to shop our stores frequently. We believe our multi-channel strategy supports our brand building efforts and provides us with synergistic growth opportunities across all of our sales channels.

Compl. at ¶ 61. Plaintiff alleges that the highlighted statement was false and misleading when made because it omitted material facts and Defendants knew that Body Central's merchandise was not updated, was missing trend items, and contained outdated fashions that the company had offered in previous years. Plaintiff further alleges that the statement was false and misleading because Defendants knew that the company was not meeting internal sales goals in the fourth quarter of 2011. Compl. at ¶¶ 62, 65.

### 3. January 9, 2012 Press Release

On January 9, 2012, Body Central issued a press release announcing its fourth quarter 2011 sales results. In the press release, Weinstein stated:

*Our fourth quarter sales were driven by our continued focus on providing on-trend fashion at value prices. In addition to the solid comparable store sales increase, our new stores* and e-commerce business *turned in a strong sales performance for the fourth quarter. Due to the unseasonably warm weather, we took timely markdowns on cold weather categories to ensure that we were in a good inventory position to start the new year. We believe that our overall sales results continue to validate our future growth potential.*

Compl. at ¶ 66. Plaintiff alleges that these statements were false and misleading because they omitted material facts and Defendants knew, or recklessly disregarded, that the company was failing to update its merchandise as fashion trends shifted, and its buying department repeatedly re-ordered items (including items that had previously sold on clearance). Plaintiff alleges that, contrary to the press release, the "timely markdowns" were required not because of the weather, but rather because of the staleness of the merchandise. Finally, Plaintiff alleges that, contrary to the press release, the company's "overall sales" did not validate its future growth potential because another key factor—the company's short-staffing issues—left it ill-equipped to grow its declining sales. Plaintiff therefore alleges that Defendants lacked a reasonable basis for the optimistic

statements contained in the press release. Compl. at ¶ 67.

### 4. March 8, 2012 Press Release and Conference Call

On March 8, 2012, Body Central issued a press release. Announcing the company's financial results for the fourth quarter and fiscal year 2011, the release stated:

> We closed 2011 with strong sales and earnings growth in the fourth quarter. *In addition, we ended the quarter with inventory current and on plan. We are against two consecutive years of mid-teen comp sales increases in the first quarter and have experienced a softening in our sales trend quarter-to-date.* Our direct business is ahead of plan. *We have taken steps to enhance the merchandise assortment and expect sales trends to improve in the second quarter. Also, we are on track to open at least 35 new stores this year including 4 new stores and 2 store closings in the first quarter of 2012. We remain confident in our ability to drive positive comp sales and margin improvement for the year.*

Compl. at ¶ 68. Discussing the company's first quarter and fiscal year 2012 outlook, the release stated:

> *For the first quarter of fiscal 2012, the Company expects net revenues in the range of $80 million to $82 million and diluted earnings per share in the range of $0.34 to $0.36, based on diluted weighted-average shares outstanding of 16.2 million.*
>
> *For fiscal 2012, the Company expects net revenues in the range of $343 million to $348 million and diluted earnings per share in the range of $1.46 to $1.50, based on diluted weighted-average shares outstanding of 16.3 million.*

Compl. at ¶ 69.

That same day, Body Central hosted a conference call. Weinstein, Angelo, and Stoltz participated in the call on behalf of the company, with Stoltz reiterating the company's recently-issued financial guidance for the first quarter and fiscal 2012. While discussing the company's first quarter 2012 sales, Weinstein stated:

> *As always, our merchandising team follows our test and reorder philosophy. We underestimated demand for one important lifestyle category. This has resulted in softer than expected sales quarter-to-date. We have taken corrective action and expect this category to improve as we head into the second quarter. We do expect margins to be below last year but on our plan.*
>
>       \*     \*     \*
>
> *Our goal continues to be to expand our store at least 15% per year, drive comparable store sales increases to improve merchandise assortments and allocation, continue to grow the direct channel and to learn more about our customer and in turn, build our brand. We expect to continue [to] deliver 20% earnings growth for the foreseeable future.*

Compl. at ¶¶ 70. Despite these "softer than expected sales," Weinstein further stated that Body Central's *"inventory ended on plan and was current."* Compl. at ¶ 71. When asked to elaborate on the timing of these softening sales, Weinstein responded:

> *Late in the fourth quarter, one particular category, it became obvious that we needed to intensify, we had—we needed to—we underestimated our commitment to those goods, and so the merchandising team went to work to build that up. Thankfully it is a category that has relatively short lead times. So we expect to see, toward the very end of this first quarter on into*

*the second quarter, to see improvement there.* It had nothing to do with prior season goods.

Compl. at ¶ 72. In response to a follow-up question, Weinstein assured that the softening of sales was limited to a *"single category that we've had some trouble in. But we have a policy of not elaborating on the specific categories. It's isolated to one thing."* Compl. at ¶ 73.

Later in the call, an analyst asked whether this underestimated commitment meant that the company did not have enough of some category or some product. Weinstein responded:

> *That's right. We read that it was slowing down, it in fact started to slow down for a little bit, but it took a big spurt and there we were a little—since we react pretty quickly, we wound up—we found ourselves under-prepared, but thankfully it is a category that is a real good chase category for us. And that is what they have been doing—working to move merchandise up, and increase the amount of testing in the category to make sure that w hen we do buy the bigger purchases, that they are more proven.*

Compl. at ¶ 74. When asked whether he was seeing sales improve, Weinstein answered *"Yes."* Compl. at ¶ 75. He also stressed that the merchandise problem was contained, stating, *"The category where we are short of goods is where the issue is. That's what we are working on . . . . The rest of the business is fine."* Stoltz added that if the category had *"been up to our expectations, we would have been in the low-, mid-single digits* [comps]. "Weinstein added," *That's right, yes."* Angelo also added, *"That is correct."* Compl. at ¶ 76.

When another question requested clarification of Body Central's merchandise struggles, Angelo stated:

> Yes, in the fourth quarter it was showing as not as important of a trend, and so we, on purpose, planned it a little down because that is what the customer was saying. *But it turned on in the first quarter, and we are absolutely responding to these trends. And we let our customers decide what the best course of action is, and they have voted with their dollars. We are chasing it, and we feel confident that we can be in position very shortly.*
>
> \*    \*    \*
>
> Yes, but it takes time to flow in, so it's a flow, it's not in one day you get it all in.
>
> \*    \*    \*
>
> *It's already started, but we want to be in full position in this category.* Compl.

at ¶ 77. Weinstein then followed up, stating, "*I think it was just we underestimated what* [sic] *the category that they wanted."* Compl. at ¶ 78. The next day, March 9, 2012, the market price of Body Central common stock fell 6.8%. Compl. at ¶ 81.

Plaintiff alleges that these highlighted statements were false and misleading because they omitted material facts and Defendants did not take steps to enhance Body Central's merchandise assortment but instead continued to carry repetitive merchandise. Plaintiff also alleges that the statements were false because the company's problems were not "isolated to one thing" and the rest of the business was not "fine"—the company was experiencing a horrible January and February 2012 and was failing to correct significant merchandise problems. Furthermore, Plaintiff alleges that Defendants knew, or recklessly disregarded, that it was misleading to tout their expectation that Body Central would continue to deliver 20% earnings growth for the foreseeable future, given the extensive nature of the company's merchandise

difficulties, short-staffing issue, and poor managerial morale. Plaintiff therefore alleges that Defendants' statements about the company's second quarter and full year 2012 earnings lacked a reasonable basis. Compl. at ¶ 79.

In sum, Plaintiff alleges that Defendants misled the public when they represented that Body Central's merchandise miscalculation was isolated and quickly fixable. Compl. at ¶ 80.

### 5. Body Central's 2011 Form 10–K Filed with the SEC

On March 15, 2012, Body Central filed its Form 10–K for the fiscal year that ended on December 31, 2011. Weinstein, Stoltz, and Angelo signed the form. The Form 10–K stated, in relevant part:

Our merchandising team seeks to identify current fashion trends and merchandise consistent with our brand image. We do not dictate fashion trends; rather *we focus on quickly adapting to the latest trends to provide the right merchandise at value prices every day.* Our merchandising team consists of our Chief Merchandising Officer, buyers and assistant buyers organized by product category as well as a team focused on our direct business. Our merchandising team is responsible for selecting and sourcing our product assortments, managing inventory levels and allocating merchandise to stores. We build our product assortments after careful review and consideration and select products that can be displayed in our stores in a coordinated manner to encourage our customers to purchase complete outfits.

Compl. at ¶ 82. The 2011 Form 10–K went on to state:

*Our test-and-reorder strategy enables us to respond rapidly to changing trends.* This strategy allows us to minimize our inventory risk by testing small quantities in our stores before placing larger purchase orders for a broader roll out, which minimizes fashion risk and inventory markdowns.

Compl. at ¶ 83.

Plaintiff alleges that these statements were materially false and misleading because they omitted material facts and Defendants knew, or recklessly disregarded, that the company was not quickly adapting or responding rapidly to the latest trends. Plaintiff alleges that, contrary to the Form 10–K, Body Central was not executing its test-and-reorder strategy, but was instead continuing to supply its stores with outdated, repeat merchandise that prompted a need for increased markdowns. Compl. at ¶ 84.

### 6. May 3, 2012 Press Release and Conference Call

On May 3, 2012, Body Central issued a press release reporting its first-quarter 2012 financial results. The press release revised the company's recently-issued, optimistic outlook for fiscal year 2012, stating:

*For the second quarter of fiscal 2012, the Company expects net revenues in the range of $80 million to $82 million, comparable sales to decrease in a range of 5 to 7 percent and diluted earnings per share in the range of $0.26 to $0.28, based on diluted weighted-average shares outstanding of 16.4 million.*

*For the full fiscal year, the Company now expects net revenues in the range of $333 million to $337 million, comparable sales to decrease in a range of 1 to 3 percent and diluted earnings per share in the range of $1.34 to $1.38, based on diluted weighted-average shares outstanding of 16.4 million.*

Compl. at ¶ 87. The press release included Weinstein's comments on Body Central's outlook, stating:

First quarter sales and earnings came in as expected. *We are on track to open at least 35 stores in 2012.* New stores and direct sales are outperforming our plan for volume and profitability. *However, we continue to see softness in overall store sales trends through April. We are closely monitoring our inventory levels and content. In addition, we are expanding the use of our test and reorder process. We believe that our sales performance will improve as we transition into the back-to-school and fall seasons.*

Compl. at ¶ 88.

Following the issuance of the press release, Body Central hosted a conference call, with Weinstein, Stoltz, and Angelo participating on behalf of the company. During the call, Weinstein stated:

> *We mentioned in our last call that we were seeing weakness in one of our four lifestyle categories consisting of active, casual, club and dressy which led to higher markdowns and consequently gross margin pressure. Our sales trends softened in April and, as a result, we're revising our expectations for 2012. . . . We believe we have identified the cause of our recent slowdown and are working to address the issues.*
>
> Now we'll talk about the steps we are taking to improve the results. We've adjusted our sales plan, our merchandise receipts and our markdown plans to reflect recent sales trends. As you'll recall, at the end of quarter one our average store inventory was up 5%. *We will closely monitor—we will continue to closely monitor sales trends and adjust inventory levels accordingly.*
>
> *We are also expanding our test and reorder strategy to get faster reads on selling trends.* As we've discussed in the past, we receive hundreds of sam-

ples each week from which test styles are selected. We will [expect] to increase the number of styles tested to bring even more newness into our assortment. We expect to receive a final report from our regionally completed market research and intend to review its recommendations and implement those that we believe will improve our business.

\*　　\*　　\*

In conclusion, we continue to have a three-pronged growth strategy—comparable store sales growth, new store openings and direct business expansion. *We're* currently seeing strong performance in two of these three areas and are *addressing the slowdown in our [comp] sales and remain confident in our long-term growth outlook.*

*Our goals remain to expand our store base by at least 15% annually, drive comparable store sales increases through improved merchandise assortments and allocation, expand the direct channel and continue our marketing efforts to build our brand. All of this we believe will lead to 20% annual profit growth in the long term.*

Compl. at ¶ 89. During the call, Stoltz reiterated Body Central's financial outlook for the second quarter of 2012, stating:

> Next our outlook for the second quarter of 2012—we expect diluted earnings per share in the range of $0.26 to $0.28 using a range of net income between $4.3 million and $4.6 million and diluted shares outstanding of approximately 16.4 million. *Our second-quarter 2012 earnings are based on estimates of total revenue from $80 million to $82 million based on comp store sales of negative 5% to negative 7%.* We have opened eight new stores and closed nine in the year to date and expect to open 11

more stores before the end of the second quarter.

*For the full year 2012 we expect diluted earnings per share in the range of $1.34 to $1.38 using a range of net income between $22 million and $22.6 million.* This assumes a tax rate of approximately 37.5% and shares outstanding of approximately 16.4 million. *Our fiscal year 2012 earnings are based on estimated net revenues in the range of $333 million to $337 million, assuming a low-single-digit comp store sales decrease and at least 35 new store openings.* We expect sales from our direct business to increase in the mid- to high-single-digit range for the full year.

Compl. at ¶ 90.

When a participant in the call asked a question regarding the cause of weakness in the quarter, Angelo responded:

We saw that our best-performing category was the trend casual which really performed well. And some of the other categories that we're known for were slightly not as important. And so we may have lost a little bit of ground in those categories.

Compl. at ¶ 91. Another question asked how long it would take for Body Central to fix its "miss," and whether it would be "more than the four to six week lead time that you guys normally work with." Angelo answered:

*We hope not. We certainly are doing everything we possibly can in the merchandising and marketing side to improve the trends. But because we can only do the best we can, we think that we want to be conservative in our approach and say that it could take a little longer to fix. But overall we feel optimistic that we will fix it shortly and start seeing increases.* We haven't seen decreases, we've had 12 con-tinuing quarters of increasing sales comps.

Compl. at ¶ 92. Weinstein also commented on the company's trends, stating:

*I think what we saw as we entered into April is a more generalized confidence in our entire business. And because of that and because of trends we're seeing now, we want to be conservative in our expectations as we move out of the second quarter into the third quarter.*

Compl. at ¶ 93. In response to a question pointing out the "significant deceleration for 2Q" guidance, Stoltz stated:

We don't speak to individual weeks or months, but *the guidance of minus 5% to minus 7% for the quarter is what we're comfortable with. As I mentioned previously, we have seen a further softness in our business as we entered April and got past Easter. So I think we'll just leave it at that.*

Compl. at ¶ 94. When someone asked about expansion of the company's test-and-reorder process, and whether the "goal there is to ... add more newness," Angelo responded:

I can answer that. *We are being more diligent than ever on the test and reorder strategy. We are taking only the top-performing items and reordering those with our—keeping our inventories in line, we are spending all our money on the best producing products, no doubt, not going beyond what our open to buy or what our sales plans are.*

*So we are really diligent in trying more testing, we feel confident—it always made us the success that we've had and we're going to stay true to our system, just be more and more diligent*

*and increase our marketing efforts as well.*

Compl. at ¶ 95.

After these disclosures, investors began to lose confidence in the company, an d Body Central common stock lost almost half its value, plummeting approximately 48.55% by the close of business on the following day. Compl. at ¶ 97. Even so, Plaintiff alleges that these disclosures did not reveal the whole truth, and that the bolded and italicized statements were false and misleading for three reasons. First, Plaintiff alleges that the statements omitted material facts. Second, Plaintiff alleges that Defendants misled the market by pointing to planned store openings, a deceitful indicator of Body Central's performance, and Defendants knew sales would continue to suffer for a prolonged period due to extensive merchandise and short-staffing problems. Third, Plaintiff alleges that Defendants knew they were failing to execute the company's test-and-reorder strategy and the company was not re-ordering only the top performing items. For these reasons, Plaintiff alleges that Defendants lacked a reasonable basis for their revised financial guidance for the second quarter and fiscal year 2012. Compl. at ¶ 96.

### D. The Ugly Truth Emerges—June 18, 2012

On June 18, 2012, Defendants issued a press release that yet again slashed their sales and earnings predictions for second quarter and fiscal year 2012. The release revealed that second quarter sales had not recovered, aggressive markdowns would continue, and the sales slump would persist into the third quarter. Compl. at ¶¶ 104, 105. The market swiftly responded to this second round of bad news, and by close of business on the date of the press release, the price of Body Central common stock had again fallen more than 48%, settling at a price more than 73% less than its class-period high of $30.69 per share on April 27, 2012. Compl. at ¶¶ 106, 110. Plaintiff alleges that the June 18, 2012 press release revealed the company's true financial condition, causing the market to remove the artificial inflation in Body Central stock price that Defendants' previous false statements had created and sustained.

### E. Defendants' Stock Sales

Plaintiff alleges that while Defendants carried out their scheme to artificially inflate the price of Body Central stock, Defendants Weinstein and Angelo—along with Angelo's father, Jerrold Rosenbaum—cashed in on the fraud. The Amended Complaint focuses especially on sales that occurred between May 1 and May 3, 2012—the date on which Body Central released its first significantly downbeat guidance. During these three days, Angelo and her father sold a combined 99,591 shares of the company's stock for $2,923,163. These sales occurred only days after Body Central stock hit its all-time high, and the next day, on May 4, 2012, the market price of Body Central common stock fell 48.55% due to the company's downbeat May 3 press release and conference call. Compl. at ¶¶ 5, 6, 11, 86.

The Amended Complaint alleges that other sales indicate that the individual defendants knowingly or recklessly misled the investing public for personal gain. In total, from the beginning of the class period until May 3, 2012, Angelo sold 148,711 shares (including the 14,456 shares that she sold between May 1–May 3, 2012), generating proceeds of $3,862,581, for an average sale price of $25.97 per share. Compl. at ¶ 20. Weinstein sold 35,354 shares of Body Central stock during this time span, generating proceeds of

$892,084, for an average sale price of $25.23 per share. Compl. at ¶ 18. After May 3, 2012, neither Weinstein nor Angelo sold stock for the remainder of the class period. Compl. at ¶ 120. Plaintiff alleges that their class-period sales constitute insider trading proceeds and show their motivation for misleading the investing public. *Id.*

### F. Post–Class Period Events

The Amended Complaint notes that Weinstein resigned from his CEO position and from the company's board of directors on August 16, 2012. Compl. at ¶¶ 18, 113. Stoltz served as interim CEO and would become COO. Compl. at ¶¶ 19, 113. On November 27, 2012, *The Wall Street Journal* published an article entitled "Executives' Good Luck in Trading Own Stock." The article examined "20,237 executives who traded their own company's stock during the week before their companies made news," explicitly mentioning the sales that Angelo and her father completed in early May 2012. Compl. at ¶¶ 114, 115. On December 10, 2012, *The Wall Street Journal* published another article, entitled "Insider–Trading Probe Widens, U.S. Launches Criminal Investigation into Stock Sales by Company Executives." This article reported that Angelo and her father were under investigation by the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation. Compl. at ¶ 116. Plaintiff alleges that Angelo and her father remained under investigation as of the date of the Amended Complaint, but does not allege that the investigation resulted in criminal charges. Compl. at ¶¶ 12, 117.

## II. LEGAL STANDARDS

### A. Elements

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission] may prescribe." 15 U.S.C. § 78j(b). Under the authority of this provision, the SEC has promulgated Rule 10b–5, which provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ To state a claim under § 10(b) and Rule 10b–5, a plaintiff must allege:

> (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

*Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1236–37 (11th Cir.2008); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Defendants' Motion to dismiss focuses on the

first and second elements, and this Court will therefore discuss only those elements in detail.

■■■ As to the first element, "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir.2011) (quoting 17 C.F.R. § 240.10b–5(b)). "A statement is misleading if 'in light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it.' " *FindWhat Investor Group*, 658 F.3d at 1305 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir.1968)) (alterations provided by *FindWhat Investor Group* ). "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *FindWhat Investor Group*, 658 F.3d at 1305 (internal quotation marks omitted). But this does not require corporations to disclose all facts that would be interesting to the market—"[a] corporation has a duty to neutralize only the *natural and normal implication* of its statements." *Id.* (internal quotation marks omitted) (emphasis added).

■■■ As to the second element, scienter may be alleged by pleading facts that denote "severe recklessness" or an "intent to deceive, manipulate, or defraud." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir.1999); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Bryant*, 187 F.3d at 1282 n. 18 (internal quotation marks omitted). "While allegations of motive and opportunity [to commit fraud] may be relevant to a showing of severe recklessness . . . such allegations, without more, are not sufficient to demonstrate the requisite scienter. . . ." *Id.* at 1285–86.

■■ Additionally, to state a claim against individual defendants for a company's misrepresentations or omissions, § 20(a) requires a plaintiff to allege that the individual defendants controlled the company, either directly or indirectly, and that they directly or indirectly induced the misrepresentations or omissions. 15 U.S.C. § 78t(a). When, as here, § 20 claims are "predicated upon the same alleged unlawful conduct relevant to" § 10b–5 and Rule 10b–5 claims, the § 20 claims cannot survive dismissal of the underlying § 10b–5 and Rule 10b–5 claims. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir.2006); *see also Kinnett v. Strayer Educ., Inc.*, 501 Fed.Appx. 890, 894 (11th Cir.2012) ("Because a primary violation of the securities laws constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a § 20(a) claim only where the plaintiff adequately pleads a primary violation.").

**B. Pleading Standards**

A complaint alleging violations of § 10(b) and Rule 10b–5 must satisfy three pleading standards to continue past the motion to dismiss stage into discovery. *FindWhat Investor Group*, 658 F.3d at 1296. First, it must contain "a short and

plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Mere "labels and conclusions," and a mere "formulaic recitation of the elements of a cause of action," will not suffice. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Instead, while they need not be detailed, the complaint's non-conclusory, factual allegations must be enough to "state a claim to relief that is plausible on its face," not merely a claim that is "conceivable." *Id.* at 555, 570, 127 S.Ct. 1955. In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence" of the required elements, even though a "savvy" judge might think that "actual proof of those facts is improbable." *Id.* at 556, 127 S.Ct. 1955. When considering a Rule 12(b)(6) motion to dismiss, however, courts must accept as true all well-pled factual allegations. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Courts must consider the complaint in its entirety, and may also consider matters that may be judicially noticed. *Id.* In particular, relevant documents required to be filed—and actually filed—with the SEC, and other public records are amenable to judicial notice. *Bryant,* 187 F.3d at 1278, 1280; *La Grasta v. First Union Secs., Inc.,* 358 F.3d 840, 842 (11th Cir.2004) (allowing judicial notice of stock prices on a given date). Additionally, courts may consider documents attached to a defendant's motion to dismiss when they are central to the plaintiff's claim and their authenticity is undisputed. *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir.2005); *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir. 1999).

■ Second, because it alleges fraud, the complaint "must state with particularity the circumstances constituting fraud,"

although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). This requires a plaintiff to allege:

(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Group,* 658 F.3d at 1296.

■ Third and finally, the complaint must meet the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737 (codified as amended in scattered sections of Title 15 of the United States Code). *FindWhat Investor Group,* 658 F.3d at 1296. Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties." *Tellabs,* 551 U.S. at 313, 127 S.Ct. 2499. The PSLRA curbs abusive private securities litigation mainly through two mechanisms. First, it provides that when a private securities claim is brought, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss...." 15 U.S.C. § 78u–4(b)(3)(B). Second, the PSLRA imposes "[e]xacting pleading requirements." *Tellabs,* 551 U.S. at 313, 127 S.Ct. 2499. Under the PSLRA, for Rule 10b–5 claims predicated on allegedly false or misleading statements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which

that belief is formed." 15 U.S.C. § 78u–4(b)(1). Furthermore, for all private Rule 10b–5 actions requiring proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with [scienter]." *Id.* § 78u–4(b)(2)(A) (emphasis added). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499. Any omissions or ambiguities weigh against an inference of scienter. *Id.* at 326, 127 S.Ct. 2499. "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute." *FindWhat Investor Group,* 658 F.3d at 1296. "[C]onclusory allegations are insufficient to establish a strong inference" of scienter. *Thompson v. RelationServe Media, Inc.,* 610 F.3d 628, 634 (11th Cir.2010) (internal quotation marks omitted). "In sum, the reviewing court must ask: When the [factual] allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs,* 551 U.S. at 326, 127 S.Ct. 2499.

## III. DISCUSSION

Defendants have moved to dismiss the Amended Complaint, arguing that dismissal with prejudice is warranted for three independent reasons: (1) Plaintiff alleges no particularized facts showing that any challenged statement was false or misleading when made, but instead relies on five confidential witnesses who can provide information only about the stores they supervised and who lacked knowledge of Body Central's overall corporate forecasts or expectations; (2) all of Body Central's forward-looking statements (and their stated factual assumptions) contained sufficient warnings and are protected by the "safe harbor" provision contained in 15 U.S.C. § 78u–5; and (3) the Amended Complaint provides no specific facts—such as contemporaneous documents inconsistent with defendants' statements or information by a confidential witness claiming to have knowledge of what defendants believed—that suggest any defendant did not believe the statements he or she made, and Plaintiff's circumstantial evidence—class-period stock sales by Defendants Weinstein and Angelo and non-defendant Rosenbaum—cannot establish the required "strong inference" of scienter because their trading history prior to the class period "negates any such inference." (Dkt. 36 at pp. 2–3).

At bottom, aside from the immaterial and forward-looking statements, Defendants' Motion requires this Court to evaluate the relative strengths of two competing inferences. Plaintiff urges that Defendants knowingly or severely recklessly concealed the souring financial condition of Body Central to maximize their personal gain, selectively revealing only half-truths until the house of cards had already toppled. Defendants, on the other hand, urge that they timely revealed adverse financial information as they became aware of it, and they are liable for nothing more than a failure to anticipate the rapidly changing fashion tastes of young women. As to Defendants' material and non-forward-looking statements, the instant Motion requires this Court to determine whether the Amended Complaint's factual allegations make Plaintiff's inference at least as compelling as Defendants' opposing inference.

### A. The § 10(b) Claim

#### 1. Materiality

Defendants begin by arguing that many of the challenged statements are

immaterial as a matter of law and therefore inactionable. Indeed, the federal securities laws provide a cause of action only for misrepresentations or omissions that are *material*. 17 C.F.R. § 240.10b–5(b) ("It shall be unlawful for any person ... [t]o make any untrue statement of a *material* fact or to omit to state a *material* fact ....") (emphases added). "[A] misstatement or omission is material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir.2012) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

■ "Reasonable" investors do not base their investing decisions on corporate "puffery"—generalized, non-verifiable, vaguely optimistic statements. Hence, courts both within and outside of this circuit have agreed that such statements are immaterial as a matter of law and therefore inactionable. *See, e.g., In re Airgate PCS, Inc. Securities Litig.*, 389 F.Supp.2d 1360, 1378–79 (N.D.Ga.2005) (phrases like "opportunity to leverage," "more effectively penetrate our combined territories," "strategic combination," "additional operating efficiencies, financial flexibility, and growth potential" are "classic examples of mere 'puffery' "); *Cutsforth v. Renschler*, 235 F.Supp.2d 1216, 1238–39 (M.D.Fla. 2002) (comment that an acquisition "continues" a corporation's "dynamic growth," "adds enhanced value," or "adds value" is inactionable puffery, as are comments that a company is "well-positioned to move forward with efforts to establish [itself] as the nation's premier provider" of a type of service and that a merger was "effective" and "quick[ ]"); *In re Royal Cruises Ltd. Securities Litig.*, 2013 WL 3295951, at *12 (S.D.Fla. April 19, 2013) (optimistic discussion of "healthy demands," an "intention to compete successfully," and the " 'encouraging' prospect of early bookings" held to be puffery); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (bank's statements regarding its " 'highly disciplined' risk management" and "standard-setting reputation for integrity" held to be puffery); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir.2004) ("generalized, positive statements about the company's competitive strengths, experienced management, and future prospects" held to be puffery); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1117–21 (10th Cir.1997) (statements that merging companies "experienced 'substantial success' in integrating [their] sales forces," the merger was moving "fast[ ]" and presented a "compelling set of opportunities," and the companies were "moving rapidly to a fully integrated sales force" held to be puffery); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217–19 (1st Cir.1996) (statements that a company's sales transition was "going reasonably well," the company "should show progress quarter over quarter, year over year," the company was "basically on track" and "very healthy," and management was "pretty optimistic" that revenue would stabilize and grow all held to be puffery); *Searls v. Glasser*, 64 F.3d 1061, 1066–67 (7th Cir.1995) (statements that a company was "recession-resistant" and would maintain a "high" level of growth held to be puffery); *Hillson Partners Ltd. v. Adage, Inc.*, 42 F.3d 204, 212–14 (4th Cir.1994) (statement that a year would "produce excellent results" and "significant gains should be seen as the year progresses" held to be puffery); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (optimistic statements that company expected "10% to 30% growth rate over

the next several years" and was "poised to carry the growth and success of 1991 well into the future" held to be puffery).

However, the level of specificity a statement must exhibit to cross the puffery threshold cannot be determined from a bright-line rule. *C.f. Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 1318, 179 L.Ed.2d 398 (2011) (the determination whether a statement is material is "inherently fact-specific" and requires consideration of a statement in its proper context). Statements that might be considered puffery in one context can be actionable in another, especially when defendants allegedly knew or recklessly disregarded facts contradicting their statements. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir.2000) (defendants' statement that "the inventory situation was 'in good shape' or 'under control' " was not puffery when "they allegedly knew that the contrary was true"); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (statement that company was doing "fine" when defendants knew that revenues were slowing may, when taken in context, be actionable); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.1992) (statement that management practices were "adequate," "conservative," and "cautious,"—when defendants intentionally or recklessly omitted facts contradicting the representations—held to be actionable); *In re Scientific–Atlanta, Inc. Securities Litig.*, 239 F.Supp.2d 1351, 1360 (N.D.Ga. 2002) (declining to treat as puffery statements about a company's success, business strategies, and growing demand because they were not too exaggerated or vague); *In re Premiere Tech. Securities Litig.*, 2000 WL 33231639, at *15 (N.D.Ga. Dec. 8, 2000) (defendants' optimistic public statements about company's infrastructure, personnel, and management held to be actionable because the defendants allegedly knew or recklessly disregarded facts con-

tradicting those statements); *In re Moody's Corp. Securities Litig.*, 599 F.Supp.2d 493, 509 (S.D.N.Y.2009) ("declaration of intention, hope, or projections of future earnings" are the "hallmarks of inactionable puffery," but consistent affirmation of a central aspect of a company's business is actionable when not couched "in the language of optimism or hope"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 239 (S.D.N.Y.2006) ("[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the opinions they touted ... or that the opinions imply certainty."); *In re Countrywide Financial Corp. Securities Litig.*, 588 F.Supp.2d 1132, 1144 (C.D.Cal.2008) (holding that while vague descriptions like "high quality" generally constitute puffery, "[plaintiff] adequately alleges that [defendant's] practices so departed from its public statements that even 'high quality' became materially false or misleading"); *In re St. Jude Medical, Inc. Securities Litig.*, 836 F.Supp.2d 878, 888 (D.Minn.2011) (vague statements held to be actionable because they were responses to specific questions raised by investors, journalists, and analysts); *c.f. also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093–95, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding, under an analogous statute, that a statement that directors recommended a merger because it was "fair" and offered shareholders a "high" value for their shares was materially misleading because shareholders could reasonably infer that it was justified by provable facts, and the plaintiffs had produced evidence that the sale price of the shares did not offer a premium over the book and market price).

■ This Court agrees with Defendants that several of the statements Plaintiff alleges were false and misleading, when placed in their proper context,

amount to no more than inactionable corporate puffery. In particular, the following statements are too generalized to be susceptible to verification:

"Our comparable store sales performance demonstrates the strength of our existing stores...." Compl. at ¶ 55.

"Our third-quarter financial results reflect continued strength in our business.... [W]e have operational initiatives underway that we believe will enhance our ability to achieve our long-term growth objectives." Compl. at ¶ 56.

"Our fourth quarter sales were driven by our continued focus on providing on-trend fashion at value prices." Compl. at ¶ 66.

"We believe that our overall sales results continue to validate our future growth potential." Compl. at ¶ 66.

"[W]e focus on quickly adapting to the latest trends to provide the right merchandise at value prices every day." Compl. at ¶ 82.

"Our test-and-reorder strategy enables us to respond rapidly to changing trends." Compl. at ¶ 83.

"[We] ... remain confident in our long-term growth outlook." Compl. at ¶ 89.

"We hope [that it will not take more than four to six weeks to fix the inventory miss]. We certainly are doing everything we possibly can in the merchandising and marketing side to improve the trends. But because we can only do the best we can, we think that we want to be conservative in our approach and say that it could take a little longer to fix. But overall we feel optimistic that we will fix it shortly and start seeing increases." Compl. at ¶ 92.

"I think what we saw as we entered into April is a more generalized confidence in our entire business. And because of that and because of trends we're seeing

now, we want to be conservative in our expectations as we move out of the second quarter into the third quarter." Compl. at ¶ 93.

"So we are really diligent in trying more testing, we feel confident—it always made us the success that we've had and we're going to stay true to our system, just be more and more diligent and increase our marketing efforts as well." Compl. at ¶ 95.

These vague and generalized statements—several of which are expressly based on the opinions, "feel[ings]," "belie[fs]," "hope[s]," and "want[s]" of management—cannot give rise to a securities fraud claim. No reasonable investor would rely on them in making a decision to buy or sell Body Central stock, or view them " 'as having significantly altered the "total mix" of information made available.' " *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir.2012) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Furthermore, as described later in this Order, Plaintiff has not pled with particularity any facts showing that Defendants knew or ignored information that contradicted any of these statements when they were made. Any claims based on these immaterial, puffing statements must, therefore, be dismissed.

### 2. Falsity or Misleadingness

Defendants next argue that to the extent that the challenged statements are material, Plaintiff has failed to plead with particularity any facts showing that any Defendant made a false or misleading statement. Defendants observe that Plaintiff has failed to specifically identify any contemporaneous internal reports that contradict the challenged statements, instead relying solely on information provided by confidential witnesses. And because

the confidential witnesses lacked personal knowledge of Body Central's overall sales, Defendants argue, the information that they allegedly provided cannot show that any statement was false or misleading when made. The few comments that the confidential witnesses offered regarding the company's forecasts miss the mark, Defendants contend, and the bulk of their comments simply express dissatisfaction with the manner in which the company was managed.

■ Defendants' argument conflates the heightened pleading standard for scienter with the lower standard for pleading a false or misleading statement. While courts must carefully assess the credibility of confidential witnesses to determine whether their allegations give rise to a strong inference of scienter, *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239–40 (11th Cir.2008), the threshold is much lower for pleading a false or misleading statement. Here, the test is simply (1) whether the false or misleading statement is pled with the detail required by Rule 9(b) and 15 U.S.C. § 78u–4(b)(1); (2) whether, taken as true, the confidential witnesses' accounts are enough to make it "plausible" that the defendant's statement was false or misleading when made, *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955; and (3) whether the complaint "provides an adequate foundation for" the confidential witnesses' accounts. *Mizzaro*, 544 F.3d at 1237–38, 1247.

■ With respect to those statements that are actionable, the Amended Complaint satisfies the criteria for pleading a false and misleading statement.[2] It satisfies Rule 9(b) because it sets forth:

(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Group*, 658 F.3d at 1296. In addition, the Amended Complaint satisfies the PSLRA's pleading standard because it "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1). Plaintiff clearly identifies each optimistic public statement upon which he premises his claims, and he explains that these statements were false or misleading because Body Central's widespread stale merchandise and short-staffing problems meant that company inventory was not "current and on-trend," and stagnating sales made growth projections a misleading indicator of the company's fiscal health.

Furthermore, taken as true, the confidential witnesses' accounts are enough to make it plausible that Defendants' positive public disclosures were false or misleading when made. Although the witnesses appear to have lacked knowledge concerning Body Central's overall sales trends, all of them—including the former regional vice president, who oversaw almost 100 stores—described widespread stale merchandise and short-staffing problems in the stores under their supervision. Assuming, as this Court must, that the wit-

---

**2.** This does not mean, however, that Plaintiff has also successfully alleged facts that give rise to a strong inference of scienter. The Eleventh Circuit has upheld the dismissal of a securities fraud complaint that properly al-

leged false or misleading statements but nonetheless failed to meet the PSLRA's heightened pleading requirement for scienter. *See Mizzaro*, 544 F.3d at 1247.

nesses accurately described the conditions in over one-third of Body Central's stores, it is certainly plausible that at the time Defendants issued their optimistic public statements, lower management was spread too thin and stale merchandise lay on the shelves in most of Body Central's stores, and therefore sales were slowing overall.

Finally, the Amended Complaint provides an adequate foundation for the witnesses' statements. The similarity of the stale merchandise and short-staffing problems that they describe supports their accounts. More importantly, the Amended Complaint details the positions that the witnesses held, the stores they supervised, and the duration of their employment. *Mizzaro*, 544 F.3d at 1240. All of the witnesses bore responsibility for monitoring the sales of their stores, and it is therefore likely that they would be familiar with the trends that they describe.

### 3. Safe Harbor

Defendants next argue that to the extent any materially false or misleading statements were made, they are shielded from liability by the PSLRA's protection of forward-looking statements. The PSLRA provides a categorical "safe harbor" for "forward-looking" statements that are either immaterial or, if material, are identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u–5(c)(1)(A). Even in the absence of a cautionary statement, a defendant will not be liable with respect to a material forward-looking statement if and to the extent that "the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." *Id.* § 78u–5(c)(1)(B). Defendants argue that all of the statements that Plain-

tiff has challenged fall within the safe-harbor.

The PSLRA defines "forward-looking statement" to include, among other things: (A) "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; (B) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; (C) "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission"; and (D) "any statement of the assumptions underlying or relating to" such statements. *Id.* § 78u–5(i)(1)(A)–(D). To determine whether a company's statements are forward-looking, courts must separately analyze each statement found in a company communication. *Harris*, 182 F.3d at 804. What qualifies as a single "statement," however, depends on context, and the Eleventh Circuit has clarified how to treat economic forecasts that contain not only assumptions about the future, but also statements of present fact. "[W]hen the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a [single] forward-looking statement." *Id.* at 807.

To be "meaningful," cautionary language need not specify *the* factor that ultimately causes the forward-looking statement's projections to fail. *Harris*, 182 F.3d at 807. Nor must it specify *all* factors that could cause results to differ from a forward-looking statement's projec-

tions. *Id.* Rather, the requirement that a cautionary statement be "meaningful" is satisfied "when an investor has been warned of risks of a significance similar to that actually realized," and the cautionary statement is "tailored to the risks the business faces." *Id.; S.E.C v. Merchant Capital, LLC,* 483 F.3d 747, 767 (11th Cir.2007). This is so because the investor "is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris,* 182 F.3d at 807. However, when a risk has already occurred and corporate officers have become aware of it, the inclusion of cautionary language that omits mention of the realized risk will not cure the non-disclosure. Specifically, when "a promoter makes optimistic statements about the prospects of the business but fails to include past performance information that would be useful to a reasonable investor in assessing those statements," the Eleventh Circuit has held, "general cautionary language does not render omission of [those] specific adverse historical facts immaterial." *Merchant Capital,* 483 F.3d at 768 (describing the "bespeaks caution" doctrine, of which 15 U.S.C. § 78u–5 is a statutory equivalent). " '[T]o warn that the untoward may occur when the event is contingent is prudent, [but] to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.' " *Id.* at 769 (quoting *Rubinstein v. Collins,* 20 F.3d 160, 171 (5th Cir.1994)) (alterations added). In short, "the safe harbor of the PSLRA only applies to forward-looking statements and not misstatements or omissions of historical or contemporaneous facts." *Schultz v. Applica. Inc.,* 488 F.Supp.2d 1219, 1229 (S.D.Fla.2007).

■■ Many of the statements that Plaintiff has challenged are unquestionably forward-looking. Body Central's quarterly and annual forecasts, for example, deal almost exclusively with projections of revenues and earnings per share, and predictions of future economic performance. Compl. at ¶¶ 69, 87, 90; 15 U.S.C. § 78u–5(i)(1)(A), (C). Any present-fact statements contained in those forecasts are clearly statements "of the assumptions underlying or relating to" the projections and predictions, and therefore fall within the PSLRA's expansive definition of "forward-looking statement." 15 U.S.C. § 78u–5(i)(1)(D). In addition, the following statements are forward-looking because they describe management's plans and objectives for future operations, and the assumptions upon which those plans and objectives were based:

"Our comparable store sales performance demonstrates the strength of our existing stores while our new stores are also performing ahead of expectations. We are on target to open 33 new stores in 2011—a record for our Company." Compl. at ¶ 55.

"[W]e have operational initiatives underway that we believe will enhance our ability to achieve our long-term growth objectives In summary, our business remains healthy overall as our assortments are on trend, our merchandise margins are on plan and our operating cost continues to be leveraged. We enter the fourth quarter with our inventory fresh and on plan. We will continue to execute on our goals to expand our services at least 15% annually, drive comparable sales increases, and build our brand. We believe that by doing that we can continue to drive long-term profit growth of 20% or more." Compl. at ¶ 56.

"We closed 2011 with strong sales and earnings growth in the fourth quarter. In addition, we ended the quarter with inventory current and on plan. We are

against two consecutive years of mid-teen comp sales increases in the first quarter and have experienced a softening in our sales trend quarter-to-date. Our direct business is ahead of plan. We have taken steps to enhance the merchandise assortment and expect sales trends to improve in the second quarter. Also, we are on track to open at least 35 new stores this year including 4 new stores and 2 store closings in the first quarter of 2012. We remain confident in our ability to drive positive comp sales and margin improvement for the year." Compl. at ¶ 68.

"As always, our merchandising team follows our test and reorder philosophy. We underestimated demand for one important lifestyle category. This has resulted in softer than expected sales quarter-to-date. We have taken corrective action and expect this category to improve as we head into the second quarter. We do expect margins to be below last year but on our plan.... Our goal continues to be to expand our store at least 15% per year, drive comparable store sales increases to improve merchandise assortments and allocation, continue to grow the direct channel and to learn more about our customer and in turn, build our brand. We expect to continue [to] deliver 20% earnings growth for the foreseeable future." Compl. at ¶ 70.

"First quarter sales and earnings came in as expected. We are on track to open at least 35 stores in 2012. New stores and direct sales are outperforming our plan for volume and profitability. However, we continue to see softness in overall store sales trends through April. We are closely monitoring our inventory levels and content. In addition, we are expanding the use of our test and reorder process. We believe that our sales performance will improve as we transi-

tion into the back-to-school and fall seasons." Compl. at ¶ 88.

"Our goals remain to expand our store base by at least 15% annually, drive comparable store sales increases through improved merchandise assortments and allocation, expand the direct channel and continue our marketing efforts to build our brand. All of this we believe will lead to 20% annual profit growth in the long term." Compl. at ¶ 89.

15 U.S.C. § 78u–5(i)(1)(B),(D).

Defendants identified their forward-looking statements, and also gave detailed and tailored warnings of the risks the company faced, including the precise risks that occurred. For example, Defendants warned of a "failure to anticipate, identify or react swiftly to changes in styles, trends or desired image preferences or to anticipate demand," "[t]he loss of any of our key personnel," "significant employee turnover rates," and growth plans that could "strain our ability to staff our new stores, particularly at the store manager level." (Dkt. 37, Ex. 1 at p. 5; Ex. 3 at pp. 7, 12–13; Ex. 4 at p. 4; Ex. 5 at p. 5; Ex. 7 at pp. 4–5; Ex. 9 at pp. 5–7, 12; Ex. 12 at pp. 4–5). Even assuming that these risks had already materialized at the time the forward-looking statements were made, however, and that the cautionary statements were therefore not "meaningful," Defendants' forward-looking statements are still protected by the safe harbor. This is because, as explained below, Plaintiff has not successfully alleged that Defendants made their forward-looking statements with actual knowledge that they were false or misleading. In other words, although Body Central may have been experiencing devastating stale merchandise and short-staffing problems, Plaintiff has not alleged facts showing that Defendants were *aware* of them at the time they made their for-

ward-looking statements. These forward-looking statements are, therefore, protected by the safe harbor's shelter for false or misleading forward-looking statements made without actual knowledge of their falsity or misleadingness. 15 U.S.C § 78u–5(c)(1)(B).

#### 4. Scienter

To the extent that the Amended Complaint successfully pleads that Defendants made false or misleading material statements, it may be doomed by a failure to plead facts giving rise to the required strong inference of scienter. As noted previously in this Order, the PSLRA's heightened pleading standard requires plaintiffs to allege facts that give rise to a "strong," "cogent," and "compelling" inference that the defendants made false or misleading statements either with knowledge of, or with extremely reckless disregard for, their falsity or misleadingness. The factual allegations, taken as a whole, must give rise to this strong inference as to *each* defendant and *each* alleged violation. This is a high hurdle to surmount. Even reasonable and plausible fraud cases will be dismissed if an inference of poor business judgment—and even negligence or mismanagement—flows even slightly more naturally from the well-pled factual allegations than does an inference of scienter.

The Amended Complaint's allegations relevant to scienter fall into seven categories: (1) the extent of the company's stale merchandise and short-staffing problems; (2) Defendant Weinstein's participation in conference calls during which the concerns of lower and middle management were "definitely discussed," management's receipt of periodic sales reports, and general allegations that the individual defendants were actively engaged in the management of Body Central and had access to detailed internal information about the company's

financial condition; (3) the company's failure to meet internal sales goals in the fourth quarter of 2011; (4) the individual defendants' class-period stock sales; (5) the proximity between the upbeat guidance offered on March 8 and 15, 2012, and the downbeat guidance offered on May 3, 2012; (6) a conclusory allegation that "[t]he ongoing fraudulent scheme ... could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of ... the Individual Defendants"; and (7) the criminal investigation of Defendant Angelo and her father. This Court will first discuss these categories of allegations individually, and then will conclude that, taken collectively, they do not give rise to the required strong inference of scienter.

#### a. Extent of Stale Merchandise and Short–Staffing Problems

The Amended Complaint alleges that the stale merchandise problem was "a huge concern" among lower and middle management, and also that the short-staffing crisis was similarly widespread. Compl. at ¶¶ 40, 43–54. The Eleventh Circuit has held that such general allegations are insufficiently particular to create a strong inference of scienter. *See FindWhat Investor Group*, 658 F.3d at 1303 (allegation that "it was 'commonly known' within the Company" that the company's revenue came from fraudulent practices "is conclusory and plainly lacks sufficient particularity to create a strong inference of scienter"). Even before the Eleventh Circuit decided *FindWhat Investor Group*, district courts within the Eleventh Circuit had consistently rejected the notion that plaintiffs could generate a strong inference of scienter merely by alleging that a problem is "generally known" or "well known" within the company. *See, e.g., Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1333 (S.D.Fla.2004); *In re 21st Century*

*Holding Co. Securities Litig.*, 2008 WL 5749572, at \*9 (S.D.Fla. Nov. 7, 2008). Similarly, in this case, the Amended Complaint's conclusory allegations about the extent of the stale merchandise and short-staffing problems cannot give rise to the required strong inference of scienter.

**b. Weinstein's Participation in Calls, Management's Receipt of Reports, and the Active Engagement of Management**

█ The Amended Complaint alleges that, during weekly conference calls, middle management voiced their concerns about the stale merchandise problem to an unreceptive Weinstein. Compl. at ¶ 40. The Amended Complaint does not allege, however, what exactly was said during these conference calls, by whom these unspecified statements were said, to whom they were said, on which approximate date they were said, or in what context they were said. Additionally, while the Amended Complaint alleges that management received periodic sales reports, including lengthy and "detailed" ones that accompanied weekly conference calls between regional managers and their district managers, it does not describe with particularity the contents of these reports. Instead, Plaintiff merely alleges that they "detail[ed] the previous week's results, sales, and comparisons to prior years." Compl. at ¶¶ 22, 40–42. Notably, the Amended Complaint does not mention what these weekly sales results were, or how they compared to sales in prior years. Finally, the Amended Complaint alleges that Weinstein "always" participated in conference calls with regional managers and Body Central buyers after a "bad" week of sales, but yet again fails to specify what was said during these calls, by whom these unspecified statements were said, to whom they were said, on which approximate date they were said, or in what context they were said. Compl. at ¶ 42. These allegations are too vague for this Court to infer that Defendants acted with scienter when making Body Central's public disclosures.

To be sure, a securities fraud complaint may rely on information allegedly provided by confidential witnesses to establish a strong inference of scienter. But "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the *particularity* of the allegations made in each case, and confidentiality is one factor that courts may consider." *Mizzaro*, 544 F.3d at 1239–40 (emphasis added). The Eleventh Circuit has refused to infer scienter on the basis of non-particularized confidential witness allegations similar to those involved in this case. *See, e.g., Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir.2006) (because complaint "failed to allege what was said at the meeting, to whom it was said, or in what context," "the averment lacks the requisite particularity"); *FindWhat Investor Group*, 658 F.3d at 1304 (refusing to infer scienter from allegations that internal concern over fraud problem was discussed at a meeting one of the individual defendants attended, and vague allegation that management received reports). If a complaint fails to allege at least an approximate date for a meeting—or a single instance in an internal report—when a defendant was allegedly given specific information that contradicted or cast serious doubt upon his public statements, the Eleventh Circuit will infer that the omissions were strategic and the dates and content "would not be helpful to their allegations." *Id.* " '[O]missions and ambiguities count against inferring scienter.' " *Id.* . (quoting *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499).

District courts within the Eleventh Circuit have repeatedly held that confidential witness allegations, to be accorded much

weight, must flesh out at least some of the details of the conversations, meetings, and internal documents that they describe. *See, e.g., Cole v. Health Management Associates, Inc.,* 2009 WL 2713178, at *9 (M.D.Fla. July 17, 2009) (mere existence of internal reports insufficient to infer scienter—plaintiff must provide details, including actual content, of reports); *Druskin v. Answerthink, Inc.,* 299 F.Supp.2d 1307, 1331 (S.D.Fla.2004) (same); *In re Royal Caribbean Cruises Ltd. Securities Litig.,* 2013 WL 3295951, at *18 (S.D.Fla. Apr. 19, 2013) (same); *Waterford Township Gen. Employees Retirement Sys. v. BankUnited Financial Corp.,* 2010 WL 1332574, at *14 (S.D.Fla. Mar. 30, 2010) (generalized allegation that weekly meetings discussed profit trends and their impact on public disclosures, without providing the specific information discussed during the meetings, cannot support any inference of scienter); *Fidel v. Rampell,* 2005 WL 5587454, at *4, *7 (S.D.Fla. Mar. 29, 2005) (refusing to infer scienter when complaint failed to allege that defendants were directly told specific information that contradicted their public disclosures); *Kinnett v. Strayer Educ., Inc.,* 2012 WL 933285, at *12–13 (M.D.Fla. Jan. 3, 2012) (refusing to infer scienter when plaintiff failed to allege that a confidential witness informed any of the defendants that fraud was occurring or that the defendants discussed the fraud). Simply put, courts remain "skeptical" of confidential sources who, from behind the veil of anonymity, provide only non-specific descriptions of meetings and internal documents. *Mizzaro,* 544 F.3d at 1240.

This skepticism is, of course, overcome when confidential witnesses come forward with or describe the actual contents of contemporaneous internal reports that contradict or cast doubt on defendants' public statements. *See, e.g., Marrari v. Medical Staffing Network Holdings, Inc.,* 395 F.Supp.2d 1169, 1178, 1183–84 (S.D.Fla.2005); *see also, e.g., Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Swanson,* 2011 WL 2444675, at *8 (D.Del.2011). Similarly, courts will find a strong inference of scienter when confidential witnesses point to the specific details of first-hand interactions with a defendant in which they advised him that existing facts contradicted his public disclosures—especially when the defendant admits as much in his responses to the witnesses. *See, e.g., Primavera Investors v. Liquidmetal Tech., Inc.,* 403 F.Supp.2d 1151, 1158 (M.D.Fla.2005); *Freudenberg v. E*Trade Fin. Corp.,* 712 F.Supp.2d 171, 196–97 (S.D.N.Y.2010). The Amended Complaint has made no such particularized allegations here.

The Amended Complaint does, of course, allege that the individual defendants were hands-on, active managers who regularly received and reviewed information about the company. Compl. at ¶¶ 22, 40–42, 118. But without any detail of what these reports contained, this cannot support an inference of scienter. Otherwise, any executives working at a company with an internal reporting system would work at their peril. To impute knowledge of or extremely reckless disregard for the truth from the mere existence of an internal reporting system, and the mere active engagement of management, would allow almost any securities fraud case to proceed into discovery. *Bryant v. Avado Brands, Inc.,* 100 F.Supp.2d 1368, 1379 (M.D.Ga. 2000), *rev'd on other grounds,* 252 F.3d 1161 (11th Cir.2001); *In re CP Ships Ltd. Securities Litig.,* 506 F.Supp.2d 1161, 1168 (M.D.Fla.2007); *see also Cole,* 2009 WL 2713178, at *9 (rejecting argument that defendants, by virtue of their high positions within the company, had access to inside information and therefore "must have known" of the alleged falsity of the statements). These are precisely the

types of vague allegations that the PSLRA was meant to curtail. *In re Rexall Sundown, Inc. Securities Litig.,* 2000 WL 33539428, at *3 (S.D.Fla. Mar. 29, 2000).

In sum, this Court cannot draw a strong inference of scienter from the confidential witnesses' non-particularized descriptions of conference calls and internal reports. Had the confidential witnesses demonstrated that on or about a certain date, Defendants were directly confronted with specific information that actually contradicted—or cast serious doubt upon—their public statements, this Court would have had much more to go on. But in the absence of these types of particularized allegations, this Court cannot strongly infer from the information allegedly provided by the five confidential witnesses that any Defendant made a false or misleading statement with knowledge of—or extremely reckless disregard for—its falsity or misleadingness.

### c. Company's Failure to Meet Internal Sales Goals

■ The Amended Complaint alleges that Body Central failed to meet internal sales goals in the fourth quarter of 2011. Compl. at ¶ 37. At the same time, however, the Amended Complaint also alleges that internal sales goals were *higher* than the goals announced to investors. Compl. at ¶ 51. The Amended Complaint fails to describe the internal sales goals with any particularity—it does not mention what they were, or by what margin they were missed. Therefore, this allegation cannot serve as the basis for an inference of scienter, let alone a strong one. Taking the Amended Complaint at face value, it is entirely likely that during the fourth quarter of 2011, Body Central missed its higher internal sales goals while still remaining on track to achieve the lower forecasts that it had announced to investors. " '[O]missions and ambiguities count against infer-

ring scienter.' " *Findwhat Investor Group,* 658 F.3d at 1304 (quoting *Tellabs,* 551 U.S. at 326, 127 S.Ct. 2499).

### d. Defendants' Class–Period Stock Sales

The Amended Complaint further alleges that Weinstein, Angelo, and her father sold stock during the class period, and Plaintiff argues that this Court should draw a strong inference of scienter from these sales. Plaintiff places the greatest emphasis on the sales that Angelo and her father completed on the eve of Body Central's first significantly downbeat public guidance. Plaintiff does not allege any class-period trades by Stoltz.

The Eleventh Circuit has held that courts may consider the timing and volume of stock trades by insiders to determine whether the complaint gives rise to a strong inference of scienter. *Mizzaro,* 544 F.3d at 1253 ("Stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of [such] sales weighs against inferring scienter."). However, stock trades will only give rise to an inference of scienter when they are "suspicious." *Id.* "The complaint must allege some information about the insider's trading history for [a court] to determine whether 'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 594 F.3d 783, 793 (11th Cir.2010) (quoting *Mizzaro,* 544 F.3d at 1253).

■ To assess whether stock trades are suspicious, courts look to factors such as "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading

history." *Kinnett v. Strayer Educ., Inc.,* 2012 WL 933285, at \*14 (M.D.Fla. Jan. 3, 2012) (internal quotation marks omitted). Additionally, courts have found that an inference of scienter cannot be made from sales in which defendants lack control over the timing or circumstances of the trade. *See, e.g., Druskin v. Answerthink,* 299 F.Supp.2d 1307, 1337 (S.D.Fla.2004). In particular, stock sales completed pursuant to a Rule 10b5–1 trading plan cannot support an inference of scienter unless the trading plan was adopted during the class period and the plaintiff alleges with particularity facts showing that the defendant was aware of an impending price drop at the time the plan was adopted. *In re Miva, Inc. Securities Litig.,* 544 F.Supp.2d 1310, 1316–17 (M.D.Fla.2008); *In re Immucor, Inc. Securities Litig.,* 2006 WL 3000133, at \* n. 8 (N.D.Ga. Oct. 4, 2006).

■ As Defendants note, the stock sales alleged in the Amended Complaint are not "suspicious" in terms of their amount or timing, or in comparison with Defendants' prior trading histories. During the seven-month class period, Angelo sold 148,711 shares, and Weinstein sold 35,354. But both of them sold more shares in the seven months that preceded the class period, with Angelo selling 175,-000 shares, and Weinstein selling 105,000. (Dkt. 37, exs. 13(a)–(cc); 14(a)–(v)). This fact alone strongly cuts against an inference of scienter. In addition, all of the class-period stock sales were automatic sales made pursuant to Rule 10b5–1 trading plans, thus negating any inference of scienter that would otherwise have arisen from Angelo's and Weinstein's class-period sales. (Dkt. 37, exs. 13(a)–(cc); 14(a)–(v)). Angelo's trading plan even explains the timeliness of her early-May 2012 stock trades: beginning in November 2011, Angelo's plan sold relatively consistent amounts of stock in the first few days of every month. (Dkt. 37, exs. 13(q)–(cc)).

And although the Amended Complaint also seeks to rely on the early-May 2012 stock sales completed by Angelo's father, those trades, too, were automatic trades pursuant to a Rule 10b5–1 trading plan that routinely sold shares at the beginning of the month. (Dkt. 37, exs. 15(a)–(m)). While it is alleged that Angelo established her father's trading plan in March of 2012, Compl. at ¶ 115–16, Plaintiff has failed to allege with particularity any facts showing that Angelo was aware of the impending May price drop at that time. Thus, the Rule 10b5–1 trading plans for Angelo and her father rebut any inference of scienter that might otherwise have arisen from the timing of their early-May 2012 stock sales.

In light of Defendants' prior trading histories, and in the absence of any well-pled factual allegations showing that their Rule 10b5–1 trading plans were adopted during the class period at a time when they knew of an impending price drop, this Court cannot infer scienter from these apparently routine stock sales.

### e. Proximity Between Upbeat and Downbeat Guidance

■ The Amended Complaint notes that the early-May 2012 press release and conference call—Body Central's first significantly downbeat public outlook—followed closely on the heels of the company's optimistic public guidance issued on March 8, 2012. Compl. at 87. Although insufficient standing alone, a short time period between upbeat and downbeat public disclosures without any apparent intervening event can be probative of scienter. *Bryant v. Avado Brands,* 100 F.Supp.2d 1368, 1384 (M.D.Ga.2000), *rev'd on other grounds by* 252 F.3d 1161 (11th Cir.2001); *Carpenters Health & Welfare Fund of Philadelphia v. Coca–Cola Co.,* 2002 WL 34089163, at \*\*15–16 (N.D.Ga. Aug. 20, 2002); *In re 21st Century Holding Co. Securities Litig.,* 2008 WL 5749572, at \*11 (S.D.Fla. Nov. 7, 2008).

The two-month time lapse between Body Central's optimistic guidance and subsequent downward revision of that forecast suggests—albeit only weakly—that Defendants might have known about their sales slump before they publicly acknowledged it in May of 2012. However, this inference is exceedingly feeble, especially in light of the fact that Defendants' March 2012 disclosures acknowledged a problem with Body Central's inventory. The short time lapse does suggest the possibility that Defendants delayed disclosure of Body Central's downward sales trend, but without additional evidence of scienter, it is more likely that Defendants timely disclosed adverse information as they became aware of it, and genuinely did not realize the scope of the stale merchandise problem until May of 2012.

### f. Allegation that the Supposed Fraud Could Not Have Occurred Without Defendants' Knowledge and Complicity

The Amended Complaint vaguely asserts that the alleged fraudulent scheme could not have occurred "without the knowledge and complicity of . . . each of the Individual Defendants." Compl. at ¶ 119. In the absence of specific supporting facts, this non-particularized and conclusory allegation is plainly insufficient to give rise to an inference of scienter. *Mizzaro*, 544 F.3d at 1250–51. As discussed earlier, the confidential witnesses do not provide the detailed information necessary to support this sweeping conclusion, and to the degree that Plaintiff relies on the extent of Body Central's short-staffing and stale merchandise problems, such reliance is misplaced.

### g. The Criminal Investigation of Defendant Angelo and Her Father

Finally, the Amended Complaint relies on the ongoing criminal investigation of Angelo and her father to generate an inference of scienter. Compl. at ¶¶ 12, 116–17. Plaintiff alleges that a *Wall Street Journal Article* that discussed 10b5–1 trading plans, including those under which Angelo and her father sold their shares in early May of 2012, led to the investigation. But Plaintiff does not allege that the investigation resulted in the filing of any charges, or even an arrest. In the absence of this information, the mere fact that an investigation is ongoing—although it bears minimally on Angelo's purported fraudulent intent—cannot in itself give rise to a strong inference of scienter. *In re Spectrum Brands, Inc. Securities Litig.*, 461 F.Supp.2d 1297, 1318 and n. 8 (N.D.Ga. 2006); *c.f. Durham v. Whitney Information Network, Inc.*, 2009 WL 3783375, at *19 (M.D.Fla. Nov. 10, 2009) (suggesting that *indictment* of a named defendant would be indicative of scienter); *Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1326 (S.D.Fla.2004) (suggesting that scienter can be inferred when executives are subject to "criminal investigation *and prosecution* ") (emphasis added).

\*     \*     \*

Taking all these factual allegations together, this Court finds that an inference of poor business judgment—and perhaps even negligence or mismanagement—is more natural than an inference that the individual defendants knowingly or severely recklessly perpetrated a fraud on the investing public. While it is certainly *plausible* that the individual defendants—to the extent that they made any actionable false or misleading statements—acted with scienter, that is not sufficient to defeat a motion to dismiss under the PSLRA's heightened pleading standards. The inference of scienter must be "cogent and at least as compelling as any opposing

inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499. Plaintiff has failed to surmount this high hurdle. Plaintiff has shown merely that the individual defendants had the motive (by virtue of their ownership of Body Central stock) and the opportunity (by virtue of their high positions in the company) to engage in securities fraud. The Eleventh Circuit has long made clear that such bare allegations of motive and opportunity, standing alone, are not enough. *Bryant*, 187 F.3d at 1285–87. All of Plaintiff's § 10(b) claims against Angelo, Stoltz, and Weinstein are, therefore, due to be dismissed.

Additionally, because the Amended Complaint's well-pled factual allegations fail to raise a strong inference of scienter as to the individual defendants, they fail to raise a strong inference of scienter as to the corporation. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F.Supp.2d 1267, 1288–89 (S.D.Fla.2008) (scienter of a corporation's officers may be imputed to the corporation under general agency principles); *see also Am. Std. Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 270–71 n. 16 (5th Cir.1981) (the knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputed to the corporation).[3] For this reason, Plaintiff's § 10(b) claims against Body Central are due to be dismissed.

### B. The § 20(a) Claims

When, as here, § 20(a) claims are "predicated upon the same alleged unlawful conduct relevant to" § 10(b) claims, the § 20(a) claims cannot survive dismissal of the underlying § 10(b) claims. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir.2006); *see also Kinnett v. Stray-*

er *Educ., Inc.*, 501 Fed.Appx. 890, 894 (11th Cir.2012) ("Because a primary violation of the securities laws constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a § 20(a) claim only where the plaintiff adequately pleads a primary violation."). Therefore, all of Plaintiff's § 20(a) claims are due to be dismissed.

### IV. LEAVE TO AMEND

Rule 15 of the Federal Rules of Civil Procedure provides, in pertinent part, that a court "should freely give leave" to amend the complaint "when justice so requires." Fed.R.Civ.P. 15(a)(2). This standard applies when a court dismisses a complaint that alleges securities fraud, and "futility" is an appropriate basis for denying leave to amend. *Mizzaro*, 544 F.3d at 1255; *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). This Court is not prepared, at this stage, to determine whether amendment would be futile. Therefore, Plaintiff will be given leave to amend.

### V. CONCLUSION

In light of the foregoing discussion, it is **ORDERED:**

1. Defendants' "Unopposed Motion for Oral Argument" (Dkt. 35, filed April 23, 2013) is **DENIED;**

2. Defendants' "Corrected Motion to Dismiss Corrected Amended Class Action Complaint with Incorporated Memorandum of Law" is **GRANTED;**

3. The Amended Complaint (Dkt. 25, filed Feb. 26, 2013) is **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6) of the Federal Rules of Civil Pro-

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

cedure for failure to state a claim upon which relief may be granted;

4. Plaintiff shall have twenty-one (21) days from the date of this Order to file an amended complaint; and

5. If Plaintiff does not file an amended complaint within twenty-one (21) days from the date of this Order, this case will be dismissed with prejudice.